We'll move to our next case, Doornbos v. Chicago, Mr. Needham. Good morning. May it please this honorable court, my name is Tom Needham, N-E-E-D-H-A-M, and I represent the plaintiff in this case. Joseph Doornbos is the plaintiff. He brought a federal lawsuit that brought very straightforward and uncomplicated claims. His federal claim was based on excessive force. He alleged that the three officers who arrested him on February 15, 2013, after he got off a CTA train, used excessive force when they tackled him to the ground without warning. In the world of Fourth Amendment litigation, this claim, as brought by Doornbos, was as simple and as plain as can be. Like almost all excessive force cases, it involved a factual dispute between the person who was arrested and the police about whether or not the police behavior was reasonable or unreasonable using an objective standard. However, at Doornbos' trial, at the request of the defense and over the repeated objections of Mr. Doornbos, the trial court needlessly complicated the jury's job by giving an instruction on the law that applies to stops under Terry v. Ohio. The court in this instruction tried to explain to the jury what a, quote, investigatory stop, end quote, is. However, Doornbos didn't bring a claim in his lawsuit for unlawful detention or for false arrest. He could have. There is a recognized cause of action in this circuit for that type of lawsuit. In 2014, this court decided a case called Huff v. Reichart, which was exactly that. Not a false arrest case, not an excessive force case, just a claim based on Terry. But in this case, Doornbos didn't bring that claim. He brought a simple excessive force case. And the instruction here, therefore, focused the jury on an issue that was not even being called upon to decide. It was a non-pattern instruction, and it didn't even completely or fully state the law that applies to police officers when they stop people under the authority of Terry v. Ohio. Under Fourth Amendment law, the circumstances of the use of force are relevant, right? That's true. Including, for example, how serious might the suspected offense be? Right, that's one of the factors. And I guess I have some trouble with the notion that a district judge abuses his discretion by giving any instruction here. But I also understand you to be arguing that the Terry instruction should at least have included the standard for a frisk, which wasn't satisfied here, and that the judge answered the jury's question during deliberations incorrectly in saying that the officers had no duty to identify themselves, or that whether they did wouldn't matter. Right. The instruction, there is a pattern instruction for excessive force cases, and it was given in this case. And it says there's basically three elements. There was force used unreasonably, and then the second one, it tells the jury they have to look at it from the perspective of the police officer with the facts he knows at that time, not with something that he learns after the fact. And the third factor is, I'm sorry, I'm blanking right now, but there are three elements, Judge, and he did give the proper instruction, but then he followed it right after that. He gave the instruction that the defendants wanted, which said, a police officer is allowed to conduct a brief investigatory stop of a citizen not rising to the level of an arrest if the officer performing this stop has reasonable suspicion that criminal activity is afoot. Is it correct that under both the plaintiffs' and the defendants' testimony, there was a physical encounter initiated by the officer? Yes. There's no dispute about that. I mean, there was a version that the officer gave that talked about what he was doing before the physical encounter and how he was surveilling and so forth. The officer was in plain clothes, right? Yes. All three officers were wearing blue jeans, hooded sweatshirts, and baseball caps. And if somebody does this to you on the street who's not a police officer, this would be which torts? Which would be what? Which torts? Oh, the assault or battery or false imprisonment, I suppose. In fact, one of the pieces of evidence that the jury did hear in this case was there were four people. Two of them testified at the trial, but two of them had their statements come in through records to the city's 911 center. Four different people saw what was happening and called 911 from their cell phones to report that a mugging or an attack was taking place. And two of those people testified? Yes. And the point is, you know, we warned the judge when we said this, that we were going into an area that the jury did not need to decide. This issue of the investigatory stop presented the jury with a dilemma or a factor that they had no business deciding. And I know that no one likes to be told, I told you so. Well, let's suppose you don't have to say, I told you so. We hear a lot of arguments along those lines. But suppose you've got an excessive force claim in the context of an arrest for a murder. Right. Okay. Does the fact that there's an arrest warrant for murder, does that somehow become relevant, for example, in evaluating the police's tactics? Well, under the jury instructions that's given in excessive force cases, one of the factors the jury is told to consider is the seriousness of the offense. If there's a warrant for someone's arrest, though, the dynamics is different, because once the person is taken into custody, they're- Well, after they're taken, I'm talking about how they execute the seizure, okay? Right. And I'm just trying to suggest that those circumstances are relevant. Right. They absolutely are relevant. Mr. Dornbo's here, according to the police version, he was getting off a CTA station with what the officer claimed was the largest can of beer he'd ever seen. And the officer was investigating the possibility that Mr. Dornbo's was drinking from the can. So- Was doing what? The officer claimed that he had to investigate whether Mr. Dornbo's was drinking from the can. Was the can ever found? The officers testified that the can was found- Is that illegal, to be drinking from a can of beer? Well, the police, the officer said that if he had discovered that the can was open, he was going to charge him with drinking on a public way or in a train station. With what? Drinking on a public way or a train station. I think the city has an ordinance- That's a crime? Yep. One of the horrors of living in a civilization, right? Right. Only if you're not drinking at all. And that point gets to, Judge, one of the- I know the defendants argue in their brief that the evidence in this case was so compelling or so overwhelming that the giving of this instruction was harmless. But the evidence was close in this case, I submit. And if you read the testimony of the officers, in fact, they were significantly impeached about this whole question of whether or not they were serving a beer can, which was the fact that the size of the can and the fact that it fell to the ground and was spraying all over the officers was something that was not contained in any of the reports they wrote on the night that Dorbos was arrested. One of the reasons, and I know we have to- we do acknowledge that we have to show some kind of prejudice to us, but in this case, the prejudice, I submit, is clear. The jury was out. I don't know if it's in the record how long, but it was about a couple hours. I tried the case. And they came back with a note to Judge Tharp saying we have a question. And there's two paragraphs in the note. Was the note appropriately answered? No, it was not, Judge. How so? Well, the jury asked the judge, and they went right to this point about the brief investigatory stop. In fact, the note actually put in quote the non-pattern instruction that the judge gave over our objection. And they were asking, the jury was asking the judge, does a police officer have to announce his office, like verbally announce his office? The short answer is no. Right. The short answer is no. But, I mean, that just shows how far from the reasonable or the use of force analysis this jury was. You know, we're not supposed to analyze what jurors consider. I'm sorry? We're not supposed to analyze what jurors consider specifically. We're supposed to say, on the whole, did they hear appropriately? The answer to the question propounded by the jury was no, and it was given. Well, but what we objected to the instruction was, now that the jury had gone off on this path about determining whether or not this was an appropriate stop under Terry. No, no, no, no, no. The judge should have added the second part of Terry, which says there's a separate level of suspicion that has to be articulated before you can put your hands on someone, which was never done. The answer specific to their question, appropriately, was no. Well, I don't. Further explanation just comes it up. Right, but the judge did give a further instruction. Okay. Are you familiar with the Eighth Circuit decision holding that in these situations, officers are required to identify themselves? Atkinson against Mountain View, Missouri. It's 709F3-1201, and an opinion by Chief Judge Riley explained that identification by a plainclothes officer in this kind of a violent encounter with a civilian is actually very relevant to the excessive force claim. Right. I was not aware of that. I wish they were aware of that at the time because we could have brought that to Judge Stark's attention. I was not aware of any authority in this circuit to answer that question. And, again, the context under which we're making these decisions about answering the question is during a jury note when we're summoned back to the court when we didn't have a whole lot of time. But I submit that if you look at the note here that came out, it shows that the jury was actually confused. The non-pattern instruction that Judge Stark gave this jury confused them, and then after he answered it and told the jury that the officer didn't have to announce his office, it appears the verdict came shortly after that. So when you say non-pattern instructions confused them, are you saying the pattern instructions were fine? Do you want other instructions? The pattern instruction that was given on excessive force was fine. There is no pattern instruction addressing Terry. Who cares about pattern instructions? Well, I can tell you litigants do because it's the first place we look. In fact, this circuit in November or December of last year, while this case was pending, actually issued a proposed instruction to cover Terry v. Ohio, which was superior in every way to the instruction that Judge Stark gave. And I'm not saying that Judge Stark should have foresaw that, but I'm saying that there is a need for that instruction, and this Court has recognized it by putting one out there for comment. Okay, thank you, Mr. Tanito. Mr. Hoekstra? May it please the Court? Mr. Dornbus has presented no reason to overturn the jury's considered verdict for defendants. At the outset, I'd like to address a point that was raised in Mr. Dornbus' reply brief and that I heard again in the opening argument, and that is that the idea that four independent eyewitnesses corroborated Mr. Dornbus' version of events by calling 911, that's simply not true. Although Dornbus presented evidence that four people called 911 to report a possible robbery or battery, he only called two of those people at trial as witnesses, and one stated that he did not see the disputed start of the encounter, which is the only part that's in dispute, and that he only saw a brief part of the encounter. The second gave a highly unreliable account of the encounter, which contradicted numerous undisputed facts of the events, including stating that the alleged victim remained on his feet the entire time, that he was not wearing a green jacket, he was never searched or handcuffed, that the attackers punched the victim and then ran away before the police even arrived on the scene. Turning to the merits, the district court did not abuse its discretion by giving an investigatory stop instruction in this case. The district court properly recognized that a stop instruction was necessary for the jury to evaluate both Dornbus' excessive force and malicious prosecution claims. What was the police officer's authority to frisk Mr. Dornbus? Well, respectfully, Your Honor, Officer Williamson testified that he never actually frisked Mr. Dornbus. His version was he was reaching out towards him, right? He was reaching out, and before he ever touched him, Mr. Dornbus knocked his hand away and then tried to pull it. Okay, so he intended to touch him, right? He didn't intend to touch him. Okay, so what would have been his constitutional authority for doing that? The officer testified that it was dark out, that Mr. Dornbus was wearing a jacket with lots of large pockets that could have hidden a weapon or any other item that may have caused physical harm to the officer. That would describe virtually anybody the officer might stop that night. And in addition to that, that it was a high crime. And Terry does require specific grounds for thinking somebody's armed and dangerous, right? That's correct, Your Honor. But Mr. Dornbus also never actually brought any claim challenging an alleged frisk. Mr. Dornbus' claim, even as described by his counsel just now, was that the officers tackled him without any justification as he came out of the train station. He never, in his complaint or in his testimony, alleged that the officers illegally frisked him. His testimony at trial was that he felt someone touch his pocket, and then he reacted, and the next thing he knew, he was on the ground, that he was tackled to the ground by three people. His claim was that the excessive force came in his being grabbed for no reason and being tackled by the officers. For that reason, the district court properly and reasonably concluded that instructing the jury on an unlawful search claim, the standard for that claim, would only confuse the jury about an issue that was not ever put at issue by Mr. Dornbus' claims. Wait a minute. But it was okay to give the stop instruction. Well, the stop instruction was relevant, as the judge concluded, because the jury needed to understand part of it, and what the jury instructed on the reasonable use of force that the jury could consider as several factors, including the need for the use of force and whether or not the subject was resisting at the time. Now, if Mr. Dornbus doesn't know these are police officers, is any of his action illegal? If Mr. Dornbus does not know? Yeah. No, Your Honor. He has a right to defend himself, right? The resisting charge actually requires that a person know, under state law, the resisting charge requires that the person knows the identity of the police officer or a law enforcement agent at the time that he resists. Because otherwise, you have a right to defend yourself from this kind of tort on the streets, right? That may be true. You can run. You can fight back, right? That's right, Your Honor. But that was really one of the primary issues for the jury to resolve in this case was whether or not Officer Williamson identified himself as he testified that he did before Mr. Dornbus resisted his efforts to stop him. And that was what led to the additional use of force to detain Mr. Dornbus after he resisted. Okay. The jury's question suggests that they were wondering about what happened with respect to identification, right? That's correct, Your Honor. With respect to the stop, the jury asked specifically whether or not the law requires an officer to identify himself before effecting a lawfully authorized stop. And then there was a follow-up question about how effective that identification must be. Okay. I gather this practice of plainclothes, sudden stops like this was part of the subject of the Department of Justice evaluation of the city of Chicago. I can't speak to that, Your Honor. But I can speak to the fact that if the jury believed Officer Williamson's testimony in this case, that Mr. Dornbus, that he had reasonable suspicion to believe that Mr. Dornbus was committing a crime by drinking alcohol on CTA property, which was illegal, and that he approached Mr. Dornbus. Initially, his testimony was, I only approached him to see whether or not the can was open. But at that point, as he reached out towards Mr. Dornbus, Mr. Dornbus reacted and resisted and attempted to flee. And at that point, that's when the force was initiated in order to prevent Mr. Dornbus from fleeing a legally authorized stop. Well, but everything Dornbus did was legal if he didn't know these were police officers. Well, that's not true. And that was disputed, right? Well, if Mr. Dornbus were indeed drinking on public property, then that was illegal. There's no evidence that he was, is there? There is evidence, and that evidence was the officer's testimony. Well, I'm sorry. You are correct, Your Honor. There's no evidence that he actually was. There is evidence that the officer perceived that he may be, that he had a reasonable suspicion. And if I'm carrying a coffee cup at a CTA station, I might have laced my coffee with rum, right? Well, Your Honor, that gets into the issue of whether that satisfies a reasonable suspicion. But here, the officers testified that they saw a beer can. That's different from seeing a harmless beverage that the officer has no reason to believe is, in fact, alcohol. Did he have any reason to believe it was open? He did not know at the time. He said from the way that Mr. Dornbus was holding the can that he thought it could have been open. And for that reason, he approached Mr. Dornbus to see if, in fact, it was open. The district court also properly exercised its discretion in this case to admit the evidence of Mr. Dornbus' possession of marijuana. The district court reasonably concluded that marijuana evidence was relevant to both of Dornbus' claims. As the district court explained, the fact that Mr. Dornbus had marijuana in his possession provided a potential explanation for why he would resist even if Officer Williamson had identified himself. When he first saw the can, why didn't he tell Dornbus that he was a police officer? According to Officer Williamson, he did. That he saw the can, and as Mr. Dornbus came out the gates, he approached Mr. Dornbus. As Dornbus did what? That the officer saw Mr. Dornbus with the can inside the station, and that as Mr. Dornbus left the station through the turnstile gates, that he approached Mr. Dornbus right at that moment, and the first thing he said to him was, police, stop, and that he raised up his shirt because he was in plainclothes to show his badge to Mr. Dornbus. And it was at that moment that he reached towards him, and Mr. Dornbus resisted. Thanks. The district court also reasonably exercised its broad discretion by concluding that the minimal risk of undue prejudice from this small amount of marijuana did not substantially outweigh its probative value. On the marijuana evidence, I understand the logic that his possession of it, unknown to the police officer, might help explain how he reacted to the officer. Let's take an excessive force case in which there's a police action shooting. Turns out the victim is not armed, although the police officer believed he was. And there's a dispute about the victim's conduct prior to the shooting. Would the fact that he was actually unarmed help make it more likely, for example, that he acted as someone who was not armed and threatening the officers? Would that fact alone? No. Would that fact be relevant to evaluate the likelihood of the victim's behavior? I believe that those are actually the facts of the Sherrod case. They are. And that this court said in that case that that was not relevant. I know. That's correct. But I'm suggesting that the logic here ought to run both directions. Well, Your Honor, in later cases like Common and Wilson and Escobedo, where there was a dispute about what happened at the time and there was evidence that could actually weigh into whether one side's version of events was more likely to be true or not, this court held that Sherrod did not borrow that evidence, although it was not the same facts. I mean, in Common… Is it correct in each of those cases, in essence, the police officers won? Did the police officers win in each? I believe so, but I'd have to go back and look, Your Honor. I don't recall off the top of my head. I'm trying to struggle with the consistency of logic in the case law. Well, Your Honor, in particular, I think Escobedo speaks to this because in Escobedo, what was at issue was the state of mind of the person who was shot by the police officers, and his sister had actually testified to his state of mind and his generally being in good spirits the day that he was shot, and the officer said, no, he was suicidal, and this was essentially suicide by cop. And this court said that once the state of mind of the person, the knowledge that they had was put at issue, that it opened the door to evidence that made the officer's version more likely to be true, and that's the same thing here. The knowledge of Mr.… Mr. Dornbus told the jury that he had no knowledge that these were police officers. Now, there was evidence that could allow the jury to conclude otherwise, and that evidence was that Mr. Dornbus had marijuana in his possession and that even though he heard the officer identify himself, that he may have reacted in a way that he now claims was innocent, but that it made the officer's version more likely to be true than not, and for that reason, this is perfectly in line with those later cases like Common, Wilson, and Escobedo. And for all those reasons, Your Honors, unless you have any further questions, we would ask that this court affirm the judgment below. Thank you. Okay, thank you, Mr. Hooper. Mr. Needham, do you have anything further? I just have a couple points on this issue about people calling 911. One of the two witnesses who did testify said, when I asked him, what did you tell the 911 call taker, he said, I said that there's someone down there on the street getting the S, the four-letter word beginning with S, kicked out of him. And so it's obvious to that person and I think to the others who made these calls. You know, it may have to be very delicate. I don't know. I'm old school and I didn't want to say something that was going to wind up in a newspaper. Well, we're old school too, but we know the word. Okay, all right. And then on this issue about whether or not the officer effectively said that he was a police officer, it's undisputed by both the officers, Dornbos, and the people who were calling 911, that Dornbos, when he was on the ground, was screaming, I'm being robbed, help police, help police. And that would be kind of completely bizarre. And that assumes that the jury didn't believe the officer when he said he indicated he was a policeman. Right, but the police officers also testified that Dornbos thought he was being robbed or was behaving like he was being robbed. Oh, he said he was. I mean, I'd ask you to consider that. Hoping for the crowd to pile in on his side. Right, but he'd be calling in an effort to get away from the police. The logic would be that he's behaving in a way that's going to actually summon more police to where he's at. So you're not trying to get the crowd to join him. No, I don't know. There was a lot of people. It was about 730 at night. We're not talking about late at night. And on this issue, you raised, Judge Hamilton, about the, I think you talked about one of these reports that came out. The ACLU entered into a consent decree with the city of Chicago. And one of the issues that, and I don't have it here, but under Rule 28J, I respectfully ask for time by the end of the week to submit a letter within the word limit. This was long after the sedan drove, wasn't it? I'm not sure, and I'll check on that. I won't waste anyone's time. But the point is that this idea, as expressed by Officer Williamson in this case, that Terry, that stop and frisk is a one word, or it's a unitary concept, is something that the Chicago Police Department has struggled with. And that's why on this report, this ISR, JSR, whatever the report is that they're required to use now, they're supposed to articulate that. So I just want to bring that up. Terry says that this frisk requires, there's something that you have to have a separate level of suspicion because even a brief intrusion in public on someone's physical body is something that can be humiliating and terrifying and upsetting. And the jury wasn't told that. And so for all the reasons I've stated today and in our brief, we're asking for Dornbus to get a new trial. Okay. Thank you very much.